IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN S. WILLIAMSON; | ) | CIVIL NO. 04-CV-885 BB WDS |
| NANCY L. WILLIAMSON; | ) | |
| GARRETT JAMES WILLIAMSON; | ) | |
| DAVID ANDREW WILLIAMSON; | ) | |
| JOHN GREGORY WILLIAMSON; | ) | |
| DEBORAH KRUHM; NEW MEXICO | ) | |
| TAXATION AND REVENUE | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| Defendants | ) | |

POST TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States of America submits these post trial proposed findings of fact and

conclusions of law.

PROPOSED FINDINGS OF FACT

I.

Background

1. In August 2004, the United States filed this suit to reduce to judgment certain income tax

assessments against John S. Williamson and Nancy L. Williamson (Williamsons). The suit seeks

to foreclose federal tax liens against the real property located at 31 Ben Road, Edgewood,

Bernalillo County, New Mexico ( "the Ben Road property"). This suit also seeks to set aside and

avoid conveyances by the Williamsons in April 1982 of the real property located at 23 Dinah Road,

Edgewood, New Mexico ("the Dinah Road property") to their then minor sons, John Gregory Williamson, David Andrew Williamson, and Garrett James Williamson, as fraudulent, and to foreclose federal tax liens against the Dinah Road property.  It also seeks to obtain a judgment against the Williamsons for any amounts remaining unpaid after the distribution and application of the proceeds when the real properties are sold and to recover the costs of this action.  Deborah Kruhm, the sister of John S. Williamson, was joined as a defendant because she may claim an interest in the Ben Road property.

2.   The Dinah Road property is located in this judicial district and is more particularly described as follows:

> Lot numbered One (1) in Block Numbered Six (6) of a plat of the lands of Frank H. Martin and James C. Farrington, which lands are commonly known as HOLIDAY HILLS as said lot is shown and designated on the plat of Holiday Hills, filed in the office of the County Clerk of Bernalillo County, New Mexico.

> Lot numbered Two (2) in Block Numbered Six (6); and Lot numbered Fourteen (14) in Block Numbered Five (5) of a plat of the lands of Frank H. Martin and James C. Farrington, which lands are commonly as known as HOLIDAY HILLS as said lots are shown and designated on the plat of Holiday Hills, filed in the office of the County Clerk of Bernalillo County, New Mexico, on May 21, 1957.

3.   The Ben Road property is located in this judicial district and is more particularly described as follows:

> Lot numbered Six (6) in Block Numbered Three (3) of the Plat of the lands of Frank H. Martin and James C. Farrington, which lands are commonly known as "HOLIDAY HILLS" and which Plat was filed in the office of the County Clerk of Bernalillo County, New Mexico.

4.  On December 29, 2005, this Court entered a Memorandum Opinion and Order, granting the first motion for partial summary judgment of the United States.  That motion sought to reduce federal income tax assessments to judgment against John S. Williamson (John)  for years 1985, 1986, 1987,  and 1993, and against Nancy L. Williamson (Nancy) for years 1994, 1995, 1996, 1997, and 1998.  The Court held that John was indebted to the United States in the aggregate amount of $157,676.67, as of May 1, 2004, and that Nancy was indebted to the United States in the aggregate amount of $36,745.73, as of May 1, 2004, plus statutory additions and accruals thereafter until paid.

5.  On August 24, 2006, the Court entered a Memorandum Opinion and Order, granting the second motion for partial summary judgment of the United States.  That motion sought to foreclose the federal tax liens on the interests of the Williamsons in the Ben Road property to satisfy their delinquent income tax liabilities.

6.  On October 13, 2006, the Court entered a Memorandum Opinion and Order, denying the third motion for partial summary judgment of the United States.  That motion sought to establish that the April 30, 1982, transfers by the Williamsons of the Dinah Road property lots  to their then minor sons should be set aside as fraudulent.  In the alternative, the Government sought to establish that the sons held title to the property as nominees of their parents.

The Court determined that the problem with the Government's constructive fraud theory was that the record revealed no evidence concerning the Williamsons' ability to pay the tax deficiencies they had incurred, or may have planned on incurring, at the time of the property transfer. The Court also found there was no evidence concerning the Williamsons' income or what other assets they might have owned when they transferred the Dinah Road property to their sons.  The Court therefore

concluded that was a genuine issue of fact, as to whether the debts the Williamsons  had incurred or planned on incurring were beyond their ability to pay, and could not grant summary judgment on the  Government's constructive fraud theory.

With respect to the actual-fraud issue, the Court found that the Government relied on the following evidence: 1) the transfer of the property was to close family members, the Williamsons' sons, and was made for no consideration; 2) the Williamsons continued to reside on the property for a number of years following the transfer; 3) the Williamsons paid the gas and  electricity bills for a partially constructed house located on the property; 4) the transfer occurred at a time when the Williamsons knew they owed money to Government and planned to incur more tax deficiencies in the future.  The Court agreed that this evidence, standing alone, would support an inference that the transfer was done with "actual intent to hinder, delay or defraud."

However, the Court found that other evidence contradicted such an inference and indicated the transfer was a genuine transfer of ownership interest from the Williamsons to their sons and was done for purposes other than defrauding a creditor.  First, Nancy testified that the reason for the transfer was that fact that here marriage to John was shaky and they transferred the property to their sons to protect them in the future "in case the marriage did not hold up." Second, the oldest son, John Gregory, testified that he had always paid the property tax on his parcel of land, and often paid the tax for his brother on their parcels and that he earned money to pay the taxes by mowing lawns and working for neighbors.  John Gregory specifically testified that his parcel of land was his, that his parents told the sons the Dinah road property was their property, and that each brother owned a lot. David Andrew, the middle son, confirmed this testimony in his deposition by stating that he

paid the real estate taxes for as long as he could remember, that he also cut lawns to raise money, and that his parents required him to pay the taxes. Thus, the Court found there was evidence in the summary judgment record that, if believed, would establish that transfer of the Dinah Road property was a genuine gift from the Williamsons to their sons and that the motivation for the gift was to ensure that the sons retained some property if the Williamsons marriage fell apart. The Court concluded that in reviewing the evidence in the light most favorable to the Williamsons, it could not grant summary judgment on the actual-fraud theory.

The Memorandum Opinion and Order also denied the first and second motions filed by the Williamsons, their sons, and Deborah Kruhm (collectively the "Williamson defendants") to dismiss the complaint, rejecting their arguments that there is no "kind of tax 1040" as frivolous and without merit. In denying the Williamson defendants' first and second motions to dismiss, the Court stated it would entertain appropriate sanction motions.

7. The Court conducted a PreTrial Conference on October 24, 2006, and set the case for a bench trial on November 6, 2006. After the PreTrial Conference, the Court granted the unopposed motion of the New Mexico Taxation and Revenue Department's to be dismissed as a defendant, as it disclaimed any interest in the Ben Road property and the Dinah Road property. The United States and the Williamson defendants appeared for trial. The United States offered many exhibits into evidence, most of which were not objected to by the Williamson defendants. The United States also called all the Williamson defendants, except for Deborah Kruhm, to testify. The Williamson defendants called no witnesses and introduced no exhibits into evidence.

II.

Facts

The facts are largely undisputed and may be summarized as follows:

1.      The Williamsons are husband and wife. They have been involved in litigation with the Internal Revenue Service (IRS) for more than two decades.  The Williamsons have a long history of not filing federal income tax returns or filing returns and asserting frivolous arguments known as "tax protester arguments" consisting of taking deductions based on constitutional objections based on Fourth, Fifth, and Sixteenth Amendments, asserting that the federal income tax statute is unconstitutional, that deficiency determinations are based on fraud perpetrated by the IRS, and that the tax assessments deny due process because they violate Fourth and Fifth, and Sixteenth Amendments.  Courts have rejected their arguments challenging the federal income tax laws as "frivolous and groundless."  *Williamson v. Commissioner*, T.C. Memo 1981-721, 1981 WL 11099 (U.S. Tax Ct.); *Williamson v. Commissioner*, T.C. Memo 1987-118, 1987 WL 40195 (U.S. Tax Ct.).

2.      After graduating from high school in Albuquerque, the Williamsons attended the University of New Mexico.

3.      Nancy received a degree in nursing from the University of New Mexico in 1967. The Williamsons were married in June 1967.

4.      John received a degree in industrial education from the University of New Mexico in 1969 or 1970.    After graduating from college, John was a junior high schoolteacher in Albuquerque public schools until 1976 or 1977.

5.    In April 1971, the Williamsons purchased the Dinah Road property, consisting of three unimproved lots.  They paid $500 for each lot.

6.    In September 1973, Isabel Williamson purchased  the Ben Road property as a vacation property for herself.  It was conveyed  by warranty deed to Isabel H. Williamson, John S. Williamson and Deborah Kruhm, as joint tenants with rights of survivorship.  Isabel Williamson was the mother of John S. Williamson and Deborah Kruhm.  She died in 1986.

7.    The Williamsons lived on the Ben Road property rent free before Isabel purchased it, while they were building a house on the Dinah Road property.  One of the Dinah Road property lots adjoins the Ben Road property.

8.    The Williamsons began building a house on the Dinah Road property in 1971, moving to the property in 1973 or 1974.  The house had two floors above ground, a basement, three bedrooms and three baths, consisting of about 4000 total square feet, and a two-car garage.  John testified that the construction of the house continued for about 30 years.

9.    The Williamsons have three sons, John Gregory Williamson, David Andrew Williamson, and Garrett James Williamson.  John Gregory was born on XXXXXXXX, 1970, David Andrew was born on XXXXXXX, 1971, and Garrett James was born in XXXXXXXX, 1976.

10.   In 1976, John started working as a water well contractor, doing business as Williamsons' Waterworks, in addition to teaching school.

11.     The Williamsons timely filed a joint federal income tax for year 1976.[1]  The IRS disallowed certain deductions claimed on the return and proposed an income tax deficiency of $608 for that year.  In 1978, the Williamsons petitioned the Tax Court for a redetermination of the asserted deficiency.[2]

12.     On December 23, 1981, the Tax Court entered a Memorandum Opinion finding in favor of the IRS and sustaining the deficiency.  The Williamsons did not appeal the adverse Tax Court decision and it became final.[3]

13.     John testified he knew that the adverse Tax Court decision would become final if it was not appealed and that the IRS would proceed to make the assessments, as he had read and knew the Tax Court rules.

14.     Nancy testified on cross examination that after the adverse Tax Court decision concerning the 1976 income taxes, she felt like she had been hit or run over by a big truck.

15.     Knowing the adverse Tax Court decision would become final and the assessments were imminent because they had not appealed the decision, the Williamsons transferred the Dinah Road property by warranty deeds to their then minor sons John Gregory, David Andrew, and Garrett James, four months later, on April 30, 1982.  On the date of the transfers, John Gregory was twelve

---

[1]This appears to be the last federal income return they filed as there is no evidence that they tax returns for years after 1976.

[2]When a petition is filed with the Tax Court, no assessment of a deficiency can be made until the decision of the Tax Court becomes final.  26 U.S.C. § 6213(a).

[3]After a decision by the Tax Court becomes final, the IRS may proceed to make the assessment.  26 U.S.C. § 6215(a).  Unless a notice of appeal is filed within 90 days after the decision is entered, a decision of the Tax Court becomes final.  Tax Ct. R. 190; 26 U.S.C. 7483.  Accordingly, the decision became final on March 23, 1982.

(12) years old, David Andrew was ten (10) years old and Garrett James Williamson was five (5) years old.   John testified the transfers were gifts, conceding that their minor sons paid no consideration for the Dinah Road property lots.

16.     The Williamsons, however, did not transfer one lot to each son.  Instead, they transferred Lot 1, Block 6 to Garrett James and David Andrew,  Lot 2, Block 6  to David Andrew and John Gregory, and Lot 14, Block 5 to Garrett James and John Gregory.  The Williamsons offered no explanation when asked why they did not simply transfer one lot of each son, but instead transferred each lot to two sons.

17.     After the transfers, the Williamsons and their three sons continued to live on the Dinah Road property, rent free, for at least ten years[4] and the Williamsons continued to pay the gas and electricity bills, and the ad valorem property taxes. [5]

18.     John testified that he also continued to operate the Williamsons' Waterworks from the Dinah Road property after the transfers.  For May 1982, the first  month after the transfers, John reported gross receipts for the Willamsons' Waterworks to the New Mexico Taxation and Revenue Department of $378.18.   The total gross receipts for the Willamsons' Waterworks for May through

---

[4]   There is evidence to suggest they continued to live on the Dinah Road property until 1998.  See Government Exhibit 67.

[5]   John testified (on deposition) that he paid the ad valorem property taxes on the Dinah Road property after the transfers.  At trial, however, John testified that his sons paid the taxes, but could not remember the years they paid them.  He attempted to explain the inconsistency in his testimony by stating that he was confused at his deposition.

December 1982, according to the returns John filed with the New Mexico Taxation and Revenue Department, were slightly more than $9,700.[6]

19.     John testified that after the transfers of the Dinah Road property lots he and his wife did not own any other real property.  The only personal property John could recall that he and his wife owned after the transfers were two old vehicles,[7] a 1964 Studebaker pickup that he drove and a 1962 Studebaker car that his wife drove.  At the time of the transfers, Nancy was not employed outside the home and earned no income.   Rather she stayed home and took care of the three young sons.

20.     On May 14, 1982, two weeks after the transfers, the IRS, in accordance with the Tax Court decision, made assessments against the Williamsons for the income tax deficiency for year 1976 and statutory additions to tax ($901.18) and gave notice of demand for payment thereof.

21.      By virtue of their neglect or failure to pay in full, after notices of assessment and demands for payment, liens arose in favor of the United States, under 26 U. S. C. §§ 6321 and 6322, as of the date of assessment in an amount equal to the unpaid assessments, plus statutory additions, against all property and rights to property, whether real or personal, of the Williamsons.

---

[6]See Government Exhibit 76.

[7]There is no evidence that these vehicles had any saleable value.

22.     On April 20, 1983, the IRS filed a Notice of Federal Tax Lien against

the Williamsons in the real property records of Bernalillo County, New Mexico, for tax year 1976

in the aggregate amount of $901.18[8] because they failed and refused to pay the assessments.

23.     The Williamsons did not file federal income tax returns for years 1977 through 1982.

24.     For taxable years 1978 and 1979, and 1980 through 1982,  the Commissioner issued

notices of deficiency to the Williamsons.  In each instance, they petitioned the Tax Court for a

redetermination of the deficiencies asserted by the IRS.  The Tax Court dismissed for want of

prosecution the first petition.  On March 3, 1987, the Tax Court, in Docket No. 42468-86, entered

a Memorandum Opinion as to the second petition, finding in favor of the IRS, determining  income

tax deficiencies in excess of $7,000 against the Williamsons for years 1980, 1981, and 1982, and

imposing $5,000 in sanctions against them for advancing frivolous and groundless arguments.

25.     On February 19, 1985, the IRS, after the dismissal of the Tax Court petition, made

assessments for unpaid federal income taxes and statutory additions to tax against John for years

1978 ($1,747.27) and 1979 ($1,749.70) and  against Nancy for years 1978 ($1,353.15) and 1979

($1,370.95).

---

[8]On August 1, 1983, the IRS filed a Certificate of Release of Federal Tax Lien against the Williamsons in
the real property records of Bernalillo County, New Mexico, for tax year 1976.  The account appears to have been
satisfied, resulting in release of the lien.

26.     On July 28, 1987, the IRS, in accordance with the Tax Court decision, made assessments for unpaid federal income taxes and statutory additions to tax against Nancy for years 1980 ($3,035.64), 1981 ($2,275.13) and 1982 ($2,730.06) and against John for years 1980 ($3,723.94), 1981 ($2,018.61) and 1982 ($4,792.07).

27.     The assessments of federal income taxes, penalties and interest against the Williamsons for years 1978 through 1982 totaled slightly more than $27,000.  This substantial tax debt does not include the Tax Court's $5,000 sanction against them for advancing frivolous and groundless arguments.

28.     By virtue of their neglect or failure to pay in full, after notices of assessment and demands for payment, liens arose in favor of the United States, under 26 U. S. C. Sections 6321 and 6322, as of the dates of assessment in an amount equal to the unpaid assessments, plus statutory additions, against all property and rights to property, whether real or personal, of the Williamsons.

29.     On October 3, 1985, the IRS filed a Notice of Federal Tax Lien  in  the real property records of Bernalillo County, New Mexico, against Nancy in the aggregate amount of $2,718.10 and against John in the aggregate amount of $3,490.97, for tax years 1978 and 1979 because they failed to pay these assessments.

30.     On January 27, 1986, the Williamsons entered into a real estate contract to purchase additional real property ("1277 Old Highway 66 property")[9] located in Bernalillo County, New Mexico, for $33,000.00, paying $4,000 in cash and signing a note for $29,000.

31.     The Williamsons purchased the 1277 Old Highway 66 property[10] in January 1986, nearly fours years after the transfer of the Dinah Road property to their minor sons, despite their unpaid federal income tax indebtedness owed to the United States for years 1978, 1979, 1980, and 1981 and despite the Notices of Federal Tax Lien filed against them for years 1978 and 1979, on October 3, 1985, more than three months before.

32.     On January 13, 1988, the IRS filed a Notice of Federal Tax Lien against Nancy L. Williamson in the real property records of Bernalillo County, New Mexico, in the aggregate amount of $8,012.83 for tax years 1980, 1981 and 1982.

33.     Because the Williamsons failed and refused to fully pay the amounts assessed against them, the IRS was authorized to use its powers of levy and distraint to compel payment. *See* I. R. C. § 6331; *G.M. Leasing Corp v. United States*, 429 U.S. 338, 349-351 (1977); *United States v. National Bank of Commerce*, 472 U.S. 713, 719-721 (1985).

---

[9]On May 9, 1998, the Williamsons signed a quitclaim deed conveying their interests in the 1277 Old Highway 66 property to Buffalo Grass Properties Management Co. Ltd. for $7,500. Deborah Kruhm, John's sister, signed the quitclaim deed for Buffalo Grass Properties Management Co. Ltd. See Government Exhibit 67. There is no evidence that the Williamsons made any payment on their federal tax debts as a result of this transaction.

[10]This property was apparently ultimately seized and sold by the IRS many years later.

34.     In February 1990, the IRS issued a Notice of Levy to First National Bank of Belen in regard to John S. Williamson d/b/a/ Williamson Water Works for federal income taxes in the aggregate amount of $41,380.34 and in regard to Nancy Williamson for federal income taxes in the aggregate amount of $32,168.08  for years 1978, 1979, 1980, 1981, and 1982.

35.     On January 25, 1990, the Court issued Warrants For Entry to enter Premises to Effect Levy based applications filed by the United States in Case No. 90-1035, styled in the Matter of Indebtedness of John S. Williamson, and in Case No. 90-1034, styled in the Matter of Indebtedness of Nancy L. Williamson.  Attached to each application was an Affidavit of Revenue Officer Richard Rose concerning the federal income taxes owed by John ($41,380.34) and Nancy ($32,168.08), as of February 28, 1990, for years 1978 through 1982.

36.     Despite notices of assessment and demands for payment and other collection efforts, including, but not limited to, the filing of notices of federal tax liens and serving of notices of levy, by the IRS, the Williamsons continued to fail and refuse to fully pay their federal income tax indebtedness to the United States for years 1978 through 1982 until the spring of 1990.[11]

37.     In late March 1990, the IRS scheduled a Public Auction Sale of the rights and interest of the Williamsons in the 1277 Old Highway 66 property for April 24, 1990.

---

[11]The Internal Revenue Service transcripts indicate that no payments were received and no credits were available to be applied to the Williamsons' federal income tax indebtedness for years 1978 through 1982 until 1990. See Government Exhibits 27 through 34. This means essentially that the Williamsons had hindered and delayed the Government's collection efforts for nearly eight years after they had conveyed the Dinah Road property to their minor sons for no consideration.

38.     On April 2, 1990, the Williamsons filed a Chapter 7 bankruptcy proceeding[12] (Case 7-90-0096 MA) to further hinder and delay the IRS from collecting[13] their federal income tax indebtedness for years 1978 through 1982. The Williamsons signed the Chapter 7 bankruptcy petition on February 17, 1990, more that a month before it was filed.

39.     John testified that no creditors received any distributions from the Williamsons' Chapter 7 bankruptcy proceeding. On January 10, 1991, the bankruptcy court entered a discharge order in the Williamsons' bankruptcy case.[14]

40.     Because the Williamsons did not file returns for years 1978 through 1982, the taxes for those years were excepted from discharge under 11 U. S. C. §§ 523 (a) (1) (B) (I) and 727 (b).

41.     So the IRS continued its efforts to collect the Williamsons' unpaid income taxes for years 1978 through 1982, by filing notices of federal tax liens and nominee liens.

42.     On July 16, 1990, the IRS filed a Notice of Federal Tax Lien against David Andrew Williamson and John Gregory Williamson, as Nominees of Nancy L. Williamson in regards to Lot 1, Block 6 of the Holiday Hills plat ( Dinah Road property) in the real property records of Bernalillo County, New Mexico in the aggregate amount of $10,585.51 for years 1978 through 1982.

---

[12]This Chapter 7 proceeding was determined to be a no-asset case and the IRS received no distribution from the bankruptcy estate.  The bankruptcy petition reflects the filing date of April 2, 1990, as do the IRS transcripts. See Government Exhibits 19 and 27 through 34.

[13]The IRS apparently canceled the April 24, 1982, auction and released the notice of levy issued to the University of New Mexico because of the automatic stay resulting from the filing of the bankruptcy case.

[14]The discharge date is reflected on the IRS transcripts. See Government Exhibits 27 through 34.

43.     On July 16, 1990, the IRS filed a Notice of Federal Tax Lien against Garrett James Williamson and David Andrew Williamson, as Nominees of Nancy L. Williamson in regards to Lot 1, Block 6 of the Holiday Hills plat ( Dinah Road property) in the real property records of Bernalillo County, New Mexico in the aggregate amount of $10,585.51 for years 1978 through 1982.

44.     On July 16, 1990, the IRS filed a Notice of Federal Tax Lien against John Gregory Williamson and Garrett James Williamson as Nominees of Nancy L. Williamson in regard to Lot 1, Block 6 of the Holiday Hills plat ( Dinah Road property) in the real property records of Bernalillo County, New Mexico in the aggregate amount of $10,585.51 for years 1978 through 1982.

45.     On March 12, 1991, the IRS filed a Notice of Federal Tax Lien against David Andrew Williamson and John Gregory Williamson as Nominees of Nancy L. Williamson in the real property records of Bernalillo County, New Mexico in the aggregate amount of $10,585.51 for years 1978 through 1982.

46.     On March 12, 1991, the IRS filed a Notice of Federal Tax Lien against Garrett James Williamson and David Andrew Williamson, as Nominees Nancy L. Williamson in the real property records of Bernalillo County, New Mexico in the aggregate amount of $10,585.51 for years 1978 through 1982.

47.     On March 12, 1991, the IRS filed a Notice of Federal Tax Lien against John Gregory Williamson and Garrett James Williamson, as Nominees of Nancy L. Williamson in the real property records of Bernalillo County, New Mexico in the aggregate amount of $10,585.51 for years 1978 through 1982.

48.     In 1994 and 1995, the IRS made assessments against John S. Williamson for unpaid federal income taxes and statutory additions to tax and gave notice of demand for payment thereof for taxable years 1985, 1986, 1987 and 1993.  Despite notice of the assessments and demand for payment, John failed to fully pay his federal tax liabilities and was indebted to the United States in the amount of  $152,676.67, as of May 1, 2004, and for interest, penalties and other additions to tax allowed by law accruing thereafter. By virtue of his neglect or failure to pay in full, after notice of assessment and demand for payment, a lien arose in favor of the United States, under 26 U. S. C. Sections 6321 and 6322, as of the dates of assessment in an amount equal to the unpaid assessments, plus statutory additions, against all his property and rights to property, whether real or personal.

49.     In 1998, 2000 and 2001, the IRS made assessments against Nancy for unpaid federal income taxes and statutory additions to tax and gave notice of demand for payment thereof for the taxable years 1994 though 1998.  Despite notice of the assessments and demand for payment, Nancy failed to fully pay her federal tax liabilities assessments and was indebted to the United States in the amount of $36,745.73, as of May 1, 2004.  By virtue of her neglect or failure to pay in full, after notice of assessment and demand for payment, a lien arose in favor of the United States, under 26 U. S. C. Sections 6321 and 6322, as of the dates of assessment in an amount equal to the unpaid assessments, plus statutory additions, against all her property and rights to property, whether real or personal.

50.     John and his three sons currently continue to operate the water well contracting business under the name The Water Works Ltd. from the 23 Dinah Road property.  John also testified his sister Deborah was involved in the business.

51.     John testified that The  Water Works Ltd., was not a sole proprietorship, partnership or corporation.  But he refused to testify what legal form or structure the business operated under and who the owners were, saying he was prohibited to do so by contract or would lose his job.

52.     John and his three sons store the drilling equipment they use in the water well contracting business at the Dinah Road property when it is not located on a job site.

53.     John does not pay his three sons rent to use the Dinah Road property to operate his water well contracting business, but his sons share in the profits of the business.

54.     The oldest son, John Gregory, received a degree in mechanical engineering in 1993 from the University of New Mexico.  He testified at trial that he had paid the property tax on his lots with money earned by mowing lawns.  John Gregory testified that his parents would go into Albuquerque once a month and drop him off to mow lawns, using the yard owner's lawnmower. John Gregory also testified that his parents told the sons the Dinah road property was their property, and that each brother owned a lot.  But he could not remember specifically when he first learned about the transfers to him other than to say it must have been around the time of the transfers.  John Gregory testified that the was 36 years old, lived with his parents, did not have a social security number and had never filed federal income tax returns.

55.     David Andrew, the middle son, attended the University of New Mexico and received a degree from  TVI.  He testified that he paid the real estate taxes for as long as he could remember from with money earned from cutting lawns but could not remember if he  actually paid the taxes for his lots in the early years after the transfers.  David testified that he was 35 years,

lives in a camper or RV on the Dinah Road property, and does not file federal income tax returns.

56.     Garrett James, the youngest son, received an associates degree from TVI.  He testified he was 29 years old and lived in Albuquerque.  But Garrett could not remember specifically when he first learned about the transfers to him or why the parents transferred the lots to him when they did.   The sons testified that they could not recall specifically what their parents had told them about why the parents transferred the lots to them.

57.     From 1989 to 1999, Nancy was employed as a staff nurse for the University of New Mexico.   Since 1999, Nancy has been employed as a nurse by the Albuquerque public school system.

58.     The IRS continued its efforts to collect the John's federal income taxes for years 1985, 1986, 1987 and 1993 and Nancy's federal income taxes for years 1994 through 1998, by filing notices of federal tax liens and nominee liens.

59.     On October 31, 1996, the Internal Revenue Service filed a Notice of Federal Tax Lien against Garrett James Williamson and David Andrew Williamson as nominees of John S. Williamson in regard to Lot 1, Block 6 of the Dinah Road property in the real property records of Bernalillo County, New Mexico in the aggregate amount of $84,682.92 for tax years 1983, 1985, 1986, 1987, and 1993.

60.     On June 1, 2004, the Internal Revenue Service re-filed a Notice of Federal Tax Lien against Garrett James Williamson and David Andrew Williamson as nominees of John S. Williamson in regard to Lot 1, Block 6 of the Dinah Road property in the real property records of Bernalillo County, New Mexico in the aggregate amount of $69,296.95 for tax years 1985, 1986,

1987, and 1993.

61.     On October 31, 1996, the Internal Revenue Service filed a Notice of Federal Tax Lien against David Andrew Williamson and John Gregory Williamson as nominees of John S. Williamson in regard to Lot 2, Block 6 of the Dinah Road property in the real property records of Bernalillo County, New Mexico in the aggregate amount of $84,682.92 for tax years 1983, 1985, 1986, 1987, and 1993.

62.     On June 1, 2004, the Internal Revenue Service re-filed a Notice of Federal Tax Lien against David Andrew Williamson and John Gregory Williamson as nominees of John S. Williamson in regards to Lot 2, Block 6 of the Dinah Road property in the real property records of Bernalillo County, New Mexico in the aggregate amount of $69,296.95 for tax years 1985, 1986, 1987, and 1993.

63.     On October 31, 1996, the Internal Revenue Service filed a Notice of Federal Tax Lien against John Gregory Williamson and Garrett James Williamson as nominees of John S. Williamson in regard to Lot 14, Block 5 of the Dinah Road property in the real property records of Bernalillo County, New Mexico in the aggregate amount of $84,682.92 for tax years 1983, 1985, 1986, 1987, and 1993.

64.     On June 1, 2004, the Internal Revenue Service re-filed a Notice of Federal Tax Lien against John Gregory Williamson and Garrett James Williamson as nominees of John S. Williamson in regard to Lot 14, Block 5 of the Dinah Road property in the real property records of Bernalillo County, New Mexico in the aggregate amount of $69,296.95 for tax years 1985, 1986, 1987, and 1993.

65.     On June 9, 1995, the Internal Revenue Service filed a Notice of Federal Tax Lien against John S. Williamson in the real property records of Bernalillo County, New Mexico, for unpaid taxes for years 1980, 1983, 1985, 1986, 1987 and 1993 in the aggregate amount of $89,553.01.

66.     On September 24, 2003, the Internal Revenue Service re-filed a Notice of Federal Tax Lien against John S. Williamson in the real property records of Bernalillo County, New Mexico, for unpaid taxes for year 1993 in the aggregate amount of $376.17.

67.     On November 20, 2003, the Internal Revenue Service re-filed a Notice of Federal Tax Lien against John S. Williamson in the real property records of Bernalillo County, New Mexico, for  unpaid taxes for years 1985 and 1987 in the aggregate amount of $32,178.60.

68.     On June 1, 2004, the Internal Revenue Service re-filed a Notice of Federal Tax Lien against John S. Williamson in the real property records of Bernalillo County, New Mexico, for unpaid taxes for year 1986 in the aggregate amount of $3,724.18.

69.     On January 19, 2000, the Internal Revenue Service filed a Notice of Federal Tax Lien against Nancy L. Williamson in the real property records of Bernalillo County, New Mexico, for unpaid taxes for year 1994 in the aggregate amount of $4,047.61.

70.     On September 5, 2000, the Internal Revenue Service filed a Notice of Federal Tax Lien against Nancy L. Williamson  in the real property records of Bernalillo County, New Mexico, for  taxes for years 1995, 1996 and 1997 in the aggregate amount of $16,684,52.

71.     On January 21, 2004, the Internal Revenue Service filed a Notice of Federal Tax Lien against Nancy L. Williamson in the real property records of Bernalillo County, New Mexico, for unpaid taxes for year 1998 in the aggregate amount of $5,703.52.

72.     Garrett James Williamson received notices that the IRS filed notices of federal tax lien against him and his brother, David Andrew Williamson, as nominees of their father, John S. Williamson, in regard to Lot 1, Block 6 of the Dinah Road property.

## PROPOSED CONCLUSIONS OF LAW

### I.

<u>The Williamsons' transfers of Dinah Road property to their minor sons were fraudulent</u>

73.     When taxpayers dispose of their property prior to the time a federal tax liens arises, the United States may sue to have the conveyance set aside as fraudulent under the law of the state where the property is located.     *Commissioner v. Stern*, 357 U. S. 39 (1958).

74.     In New Mexico, the law of fraudulent conveyances was codified by the adoption of the Uniform Fraudulent Conveyance Act, NMSA § 56-10--1 to 56-10-13. *Allied Products Corp v. Arrow Freightways,* 724 P.2d 752 (N.M. 1986).

75.     The Uniform Fraudulent Conveyance Act was repealed in New Mexico and replaced by the Uniform Fraudulent Transfer Act §§ 56-10-14 to 56-10-25, effective June 16, 1989. Since the transfers in this case took place in 1982, the Uniform Fraudulent Conveyance Act (UFCA)

rather than the Uniform Fraudulent Transfer Act (UFTA) will govern. *Cf. Production Credit Association of Minot v. Klein,* 385 N.W.2d. 485 (N.D. 1986).

76.     In any event, the New Mexico Supreme Court has held that sections 56-10-18 and 56-10-19 of the UFTA are essentially a re-certification of sections 56-10-4 and 56-10-7 of the UFCA, which voided transfers made as a result of either constructive or actual fraud. *Dona Ana Savings and Loan Association v. Doffemeyer*, 855 P. 2d 1054 (N.M. 1993).

77.     Section 56-10-4 of the UFCA provides as follows:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors *without* regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration. (Emphasis added)

78.     Section 56-10-2 of the UFCA provides as follows:

> A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

79.     Section 56-10-7 of the UFCA provides as follows:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud, either present or future creditors, is fraudulent as to both present and future creditors.

80.     Under NMSA §56-10-9A [§56-10-21A of the UFTA], a creditor may set aside a fraudulent transfer to the extent necessary to satisfy the creditor's claim.  Under NMSA §56-10-7 [§56-10-18 of the UFTA], every conveyance made with actual intent to hinder, delay or defraud, either present or future creditors, is fraudulent.

81.     Under NMSA §56-10-4 [§56-10-19A of the UFTA], every conveyance made  by a

person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to

his actual intent if the conveyance is made without a fair consideration.  The purpose of the Uniform

Fraudulent Conveyance Act was to protect creditors when a debtor has made a conveyance of his

property which diminishes the creditor's assets to the detriment of the rights of the creditor.  *Michel*

*v. J.'s Foods, Inc*. 661 P.2d 474 (N. M. 1983).

82.     To set aside a transfer under NMSA §56-10-4, the creditor must prove both

insolvency and lack of consideration by clear and convincing evidence.  *See First National Bank in*

*Albuquerque v. Abraham*, 639 P.2d 575 (N.M. 1982).

83.     Unassessed taxes are debts within the meaning of the Uniform Fraudulent

Conveyance Act.  *United States v. Plastic Electro-Finishing Corp.*, 313 F. Supp. 330 (E.D. N.Y.

1970) and *United States v. St. Mary*, 334 F. Supp. 799 (E.D. Pa. 1971).

84.     Under the UFTA, a transfer is fraudulent if it is made with the intent to merely hinder

and delay creditors, rather than to defraud them of ultimate payment.  *Flushing Savings Bank  v.*

*Parr*, 438 N.Y.S. 2d 374 (N.Y. 1981);  *Klein v. Rossi*, 251 F. Supp. 1 (E.D. N.Y. 1966); *M&N*

*Freight Lines v. Kimbel Lines*, 170 S.W.2d 186 (Tenn. 1943).

85.     The commonly accepted badges of fraud are (1) lack of fair consideration, (2)

retention of the property by the grantor, (3) the close relationship between the transferor and the

transferee and (4) the threat or pendency of legal action.  *Western Production Credit Ass'n v. Kear*,

723 P.2d 965 (N.M. 1986); *First National Bank in Albuquerque v. Abraham*, 639 P. 2d 575 (N.M.

1982).  As discussed below, in this case, all four of these badges of fraud are present.

86.     The later enacted statute, which restates elements of the Uniform Fraudulent Conveyance Act, NMSA 56-10-18B, elaborates on these badges of fraud and provides that, in determining actual intent, consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation that incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

87.     Not all the above-referenced indicia of fraud need be present to serve as a basis for inference of fraud.  *Dona Ana Savings and Loan Assoc. v. Dofflemeyer*, 855 P.2d at 1057; *In re: Taylor,* 133 F.3d 1336 (10th Cir. 1998).

88.      Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish the fraudulent intent.  *Western Production Credit Ass'n v. Kear*, 723 P.2d 965

(N.M. 1986); *Roland v. United States*, 838 F.2d 1400, 1402-03 (5th Cir. 1988).

89.    Here, the evidence demonstrates that the Williamsons' transfers of the Dinah Road property lots to their then minor sons constituted constructive fraud and actual fraud. NM Sections 56-10-4 and 56-10-7.

90.    After the transfers, the Williamsons had insufficient assets and income to pay their federal tax debts for years 1976 and 1978 through 1982.  The Williamsons were insolvent since the present fair salable value of their assets after the conveyances of the Dinah Road property was less than the amount that was required to pay their probable liability on their existing debts as they became absolute and matured.  Thus, the conveyances of the Dinah Road property lots made by the Williamsons to their then minor sons for no consideration rendered them insolvent.  Accordingly, the conveyances were fraudulent as to creditors *without* regard to their actual intent because  the conveyances were made without fair consideration.  NM Section 56-10-4.

91.    The 1976 and 1978 through 1982 income tax deficiency assessments, plus the statutory interest and penalties that over the years accrued thereon, accounted for a portion of the Williamsons' tax debt to the United States, the collection of which the Williamsons intended to delay, hinder and defeat by conveying the Dinah Road property to their then minor sons for no consideration.

92.    The evidence clearly demonstrates that the  Williamsons' transfers of the Dinah Road property lots to their minor sons were made without consideration and with intent to delay, hinder or defraud the United States as a creditor.  NM Section 56-10-7.  The transfers of the Dinah

Road property meet the criteria as fraudulent when considering the factors under Section 15-10-18 (B) that are present here.

93.     Factors (1), (2), (4), (5), (9) and (10) weigh against the Williamsons.

94.     First, the Williamsons transferred the Dinah Road property to insiders, their three minor sons.   Second, they retained possession and control of the Dinah Road property after the transfers to their sons.  After the transfers, they continued to live on the Dinah Road property, rent free, for at least ten years.  The Williamsons continued to pay the propane gas bills, the electricity bills, and the ad valorem property taxes for the Dinah Road property after the transfers, while continuing to live there with their sons.  Their sons did not interfere with their use and control of the property.

95.     The sons' testimony that they actually paid the ad valorem property taxes on the Dinah Road property after the transfers does not validate the transfers.  The Court finds their testimony not credible.   The Court finds that the Williamsons continued to pay the ad valorem property taxes after the transfers.  It is simply implausible that the Williamsons required their young sons, who were only 12, 10 and 5 years of age, to pay the property taxes on the Dinah Road property lots in the early years after the transfers.   In any event, neither the Williamsons nor their sons offered any documentary evidence to support the implausible assertion that the minor sons paid the taxes in the early years after the transfers.

96.     Third, just four months before the transfers were made, the Tax Court had issued an adverse decision concerning the Williamsons' 1976 income taxes.   John testified he knew that the adverse Tax Court decision would become final if it was not appealed and that the IRS would

proceed to make the assessments.  He knew or should have known that the IRS would them attempt to collect the unpaid taxes.

97.     Fourth, the transfer by the Williamsons of Dinah Road property was substantially all of their assets.  After the transfers of the Dinah Road property lots,  the Williamsons did not own any other real property.  The only personal property they after the transfers were two old vehicles,[15] a 1964 Studebaker pickup that John drove and a 1962 Studebaker car that Nancy drove.

98.     Fifth, the transfers by the Williamsons of Dinah Road property lots were made without receiving a reasonably equivalent value in exchange.  The  evidence clearly establishes that the Williamsons conveyed the Dinah Road property lots to their three minor sons without consideration.

99.     Sixth, the Williamsons were insolvent or became insolvent shortly after the transfer was made.   After the transfers of the Dinah Road property lots,  the Williamsons did not own any other real property.  The only personal property they after the transfers were two old vehicles, which had no salable value.  Nancy was not employed outside the home and earned no income.  For May 1982, the first  month after the transfer, John reported gross receipts for the Willamsons' Waterworks to the New Mexico Taxation and Revenue Department of $378.18.

100.     Seventh, the transfers occurred shortly before a substantial debt was incurred. Just four months before the transfers were made, the Tax Court had issued an adverse decision concerning the Williamsons' 1976 income taxes.  Two weeks after the transfers, on May 14, 1982, the IRS,  made assessments against the Williamsons for the income tax deficiency for year 1976 and

---

[15]There is no evidence that these vehicles had any salable value.

statutory additions to tax ($901.18) and gave notice of demand for payment thereof.

101.    The transfers occurred when the Williamsons intended to incur, or believed, or reasonably should have believed, that they would incur debts, including the federal income tax liabilities, beyond their ability to pay as they became due.  On the date of the transfers of the Dinah Road property lots, the Williamsons had not paid their federal income taxes for year 1976, as determined by the Tax Court only four months earlier, and had failed to file federal income tax returns for years 1978, 1979, 1980 and 1981.  The Tax Court later determined income tax deficiencies for years 1980, 1981 and 1982, and imposed sanctions against them for advancing frivolous and groundless arguments.  The assessments of federal income taxes, penalties and interest against the Williamsons for years 1978 through 1982 totaled slightly more than $27,000, excluding the Tax Court's $5,000 sanction against them for advancing frivolous and groundless arguments.

102.    The United States is deemed a creditor of a taxpayer as of the date that the obligation accrues.  *United States v. Bushlow,* 832 F. Supp. 574, 581 (E.D.N.Y. 1993).  Some courts say the tax liabilities, even if unassessed, are deemed due and owing at the close of the taxable year. *Edelson v. Commissioner*, 829 F.2d 828, 833-34 (9th Cir. 1987).  Other courts say that taxes accrue on the dates on which the tax returns were due to be filed.  *United States v. Adams Bldg. Co.,* 531 F.2d 342, 343 n.2 (6th Cir.1976);  *see also In re Luongo,* 259 F.3d 323, 334 (5th Cir.2001) (holding that a debt arises when the tax obligation accrues, and that the obligation accrues upon the occurrence of the event triggering the liability); *Selbe v. United States,* 912 F. Supp. 202, 205 (W.D. Va.1995).  Therefore, the liabilities for 1978, 1979, 1980 and 1981 arose, at the latest, when the

returns for those years were due to be filed.  There is no evidence that they requested extensions to

file income tax returns for those years.  With regard to  tax years 1978, 1979, 1980 and 1981, the

Williamsons' obligation to pay these taxes arose on the due date of the return for those years, which

was April 15 of 1979, 1980, 1981 and 1982.  Clearly, IRS's claims for 1976, 1978, 1979, 1980 and

1981 taxes arose <u>before</u> the Dinah Road property lots were transferred on April 30, 1982.  Thus, the

Williamsons were already debtors to the United States at the time of the transfers.

103.    On the date of the transfers, the Williamsons' owed income taxes, interest and

penalties, for years 1976 and 1978 through 1981, which were ultimately assessed against them in

1983, 1985 and 1987 after the Tax Court decisions became final, in excess of $15,000.[16]

104.    John admits he did not file federal income tax returns for years 1978 through and

including 2005.  There is no evidence that Nancy filed federal income tax returns for years 1978

through and including 2005.  In *United States v. Chapman*, 756 F.2d 1237 (5th Cir. 1985), the Fifth

Circuit agreed with the Government that the transfer there was fraudulent under Texas law, noting

that "[a] transfer made with a fraudulent intent to evade *future* liabilities is void as to *subsequent*

*creditors*." *Id.* at 1241 (citations omitted, emphasis added).  A conveyance made with the intent to

to delay, hinder or defraud is void as to both present and future creditors.  *Fish v. East*, 114 F.2d

177, 183 (10th Cir. 1940).

105.    The evidence clearly demonstrates that the transfers of the Dinah Road property lots

by the Williamsons to their then minor sons were made without consideration and with actual intent

---

[16]    See Government Exhibits 27 through 34, 44, 46, 50, 51,58B and 59B.  If the $5,000 sanction against
them for advancing frivolous and groundless arguments is included, the amount would exceed $20,000.

to delay, hinder or defraud the United States as a creditor.  The purported transfers of the Dinah Road property lots to their minor sons were made while the Williamsons had current federal tax liabilities and in anticipation of their incurring future federal tax liabilities and their efforts to defeat such liabilities.  At the time of the transfers, the Williamsons had failed to file tax returns for years 1977, 1978, 1979, 1980 and 1981, and had no intention of filing federal income tax returns or paying federal income taxes in the future.  They could not pay the taxes they owed for the years preceding the transfers.   In making the purported transfers, the Williamsons intended to incur, or believed or reasonably should have believed, that they would incur debts, including  federal tax liabilities, beyond their ability to pay as they became due.

106.     The Court finds that the testimony of the Williamsons and their sons is not credible. The Williamsons' explanations that the transfers were gifts and that they were made to protect the sons in the event their marriage did not survive are implausible.  First, the marriage did survive. Even if a divorce had occurred,  the Dinah Road property lots would have been owned by the Williamsons as community property. Second, the transfers only protected the Dinah Road property lots from seizure and sale by the IRS to satisfy the Williamsons' delinquent income taxes.  The transfers did not protect the sons as they owed no taxes.[17]   Third, the adverse Tax Court decision issued only four months before the transfers and the Williamsons' failure to  explain  why they did not simply transfer one lot of each son belies their contention that the transfers were gifts.

---

[17]If the Williamsons had wanted to truly provide for their sons' welfare in the event of their death, they could have established a testamentary trust.

107.    The Court finds that the Williamsons made the transfers to delay, hinder or defraud the United States as a creditor.  This is evident from the badges of fraud at the time of the transfers and their conduct after the transfers.  The Williamsons successfully delayed and  hindered  the United States as a creditor and refused to pay their taxes for the tax years 1978 through 1981 more than ten years after assessment; until the collection statutes expired.

108.    The Court also finds that the evidence is clear and convincing that badges of fraud exist and that the Williamsons' transfers of the Dinah Road property lots to their minor sons were made with actual intent to hinder, delay or defraud the United States, as a creditor.

109.    The Court therefore concludes that the transfers were fraudulent under either the UFCA or the UFTA, and should be set aside.

## II.

### The sons hold the Dinah Road property lots as nominees of their parents

110.    When legal title to property is held in the name of a third party for the benefit of the taxpayer, the courts consider that it is held in a nominal or representative capacity for the taxpayer. *United States v. Webb*, 595 F.2d 203 (4th Cir. 1979).  The property becomes subject to the taxpayer's liability.  *United States v. Miller Brothers Construction Co.*, 505 F.2d 1031 (10th Cir. 1974).

111.    To find a nominee's relationship, the courts consider whether there was consideration for the transfer; whether there was anticipation of a lawsuit or liabilities; whether the transferor retains dominion or control; the relationships between the taxpayer and the nominees; the failure to record the conveyance; retention of possession by the taxpayer; and whether or not state property taxes have been paid by the taxpayer.  When such a situation is found, the property is

impressed with a constructive trust.  The constructive trust is imposed by law because a person holding title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.  *Aragon v. Rio Costilla Coop Livestock Ass'n* 112 N.M.152, 812 P.2d 1300, 1304 (1991);  *see e.g., Garcia v. Marquez*, 101 N.M. 427, 684 P.2d 513 (1984).

112.    Whenever legal title is in one person but the beneficial interest, either from payment of the purchase price or other circumstances, is either wholly or partially in another, the courts will find that the nominees hold the property in trust, and that federal tax liens of the United States attach to the property.  *United States v. Williams*, 581 F. Supp. 756 (N.D. Ga. 1982), *aff'd,* 729 F.2d 1340 (11th Cir. 1984).

113.    The nominee characterization is utilized to determine whether property should be construed as belonging to the taxpayer if he/she treated and viewed the property as his/her own, in spite of the legal machinations employed to distinguish legal title to the property.  *In re Grothues*, 245 B.R. 828, 832 (W.D. Tex. 1999), *rev'd on other grounds*, 226 F.3d 334 (5th Cir. 2000).  *Grothues* adopted the analysis of *In re Richards*, 231 B. R. 571 (E.D. Penn. 1999), where that court further explained the nominee theory:

> Focusing on the relationship between the taxpayer and the property, the theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner.

*Richards,* 231 B.R. at 579.

114.    The critical consideration in determining whether to apply the nominee theory is whether the taxpayer exercised active or substantial control over the property.  *Richards*, 231 B.R.

at 579, *citing United States v. Kudasik*, 21 F. Supp. 2d 501, 508 (W.D. Pa. 1988). There are other factors to consider. However, they are not applied rigidly or mechanically, because no one factor is determinative. *Id.*

115. Here, as noted above, the minor sons paid no consideration for the transfers. On the date of the transfers, the Williamsons owed federal income tax liabilities. After they transferred the Dinah Road property to their sons, they retained dominion and control of the property. The relationships between the taxpayers and the nominees were that of parents and children.

116. After the transfers of their interests in the Dinah property to their minor sons, the Williamsons continued to live on the Dinah Road property and to pay the utility bills and ad valorem property taxes for at least ten years. Thus, the Williamsons continued to exercise active or substantial control over the property.

117. Based on the undisputed facts in this case, the Court concludes that Garrett James Williamson, David Andrew Williamson, and John Gregory Williamson hold title to the Dinah Road property as nominees of their parents, John S. Williamson and Nancy L. Williamson, that  the federal tax liens attach to this property and the United States is entitled to foreclose its tax liens against the  Dinah Road property.

118. Any conclusion of law which is more properly deemed to be a finding of fact is hereby adopted as a finding of fact.

For the foregoing reasons, the United States is entitled to judgment:

1) setting aside the Williamsons' transfers of the Dinah Road property lots to their sons, as fraudulent;

2) or in the alternative, determining that the sons, John Gregory Williamson, David Andrew Williamson, and Garrett James Williamson, hold title to the Dinah Road property as nominees of their parents;

3) determining that its federal tax liens are valid against the Dinah Road property; and

4) foreclosing the federal tax liens upon the Dinah Road property (and the Ben Road property), with the sale proceeds to be distributed according to the findings of this Court and the rights of the parties as determined by the Court.

Respectfully submitted,

DAVID IGLESIAS
United States Attorney


/s/ Waymon G. DuBose, Jr.
WAYMON G. DuBOSE, JR.
Trial Attorney, Tax Division
State Bar No. 06152000
U. S. Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas  75201
(214)  880-9726
(214)  880-9741 (facsimile)

UNITED STATES ATTORNEYS

<u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing Post Trial Proposed Findings of

Fact and Conclusions of Law has been made on the 16th day of November, 2006, by sending a copy

thereof by U. S. Mail, postage paid, to:


John S. Williamson
31 Ben Road
Edgewood, New Mexico 87015

Nancy L. Williamson
31 Ben Road
Edgewood, New Mexico 87015

John Gregory Williamson
31 Ben Road
Edgewood, New Mexico 87015

Deborah Kruhm
2267 Calle Pulido
Santa Fe, New Mexico 87505

Garrett James Williamson
824 Adams St. NE.
Albuquerque, New Mexico 87110

David Andrew Williamson
31 Ben Road
Edgewood, New Mexico 87015


<u>/s/ Waymon G. DuBose, Jr.</u>
WAYMON G. DUBOSE, JR.